Entered: August 15th, 2024
Signed: August 15th, 2024



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

|  |  |  |
|---|---|---|
| In re: | * | |
| | * | |
| Darcell Tia Keels, | * | Case No. 24-10522-MMH |
| | * | |
| Debtor. | * | Chapter 13 |
| * * * * * * | * | |
| | * | |
| Darcell Tia Keels, | * | |
| | * | |
| Movant, | * | |
| | * | |
| v. | * | |
| | * | |
| Wilmington Savings Fund Society, FSB, | * | |
| d/b/a Christiana Trust as Trustee for | * | |
| PNPMS Trust II, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * | * * * * * * | |

### <u>MEMORANDUM OPINION</u>

A chapter 13 case allows a debtor to rehabilitate her finances while retaining possession of her property, including her principal residence (or what we commonly refer to as an individual's home). This latter objective is often the primary reason for the debtor's bankruptcy filing. The Bankruptcy Code offers a debtor many tools to adjust her relationship with prepetition creditors and to alter some of the creditors' prepetition rights through the chapter 13 plan process. A debtor

cannot, however, do much with respect to creditors asserting prepetition liens against her principal residence. She may be able to cure prepetition arrearages and maintain postpetition payments on the mortgage, but she cannot free the property of any liens held by fully-secured or undersecured creditors.

Issues of valuation and lien priorities in the context of a chapter 13 debtor's home thus become very important in many cases, including the one before the Court. Here, the debtor asserts that her home is encumbered by a first priority lien that consumes its value, leaving the objecting creditor's lien fully unsecured. The creditor disputes the debtor's valuation of the home. It also argues that the debtor cannot strip off its lien because the lien pre-existed the debtor's ownership interest in the home. Moreover, the creditor asserts that a portion of the senior lender's lien arises from refinancings and is subordinate to the creditor's lien.

The Court has reviewed the evidence submitted by the parties, as well as applicable law. For the reasons set forth below, the Court determines that the debtor's valuation of the subject property more accurately reflects the property's market value and might support removal of the creditor's lien, notwithstanding its pre-existing nature. The Court reserves final judgment, however, on the priorities of the liens asserted against the subject property to allow appropriate and necessary due process on all affected parties.

## I.    Relevant Background

Ms. Darcell Tia Keels, the above-captioned debtor (the "Debtor"), filed a petition for relief under chapter 13 of the Bankruptcy Code[1] on January 22, 2024. ECF 1. The Debtor also has filed, and amended, her proposed chapter 13 plan. ECF 4, 22, 24, 39, 44. The primary issues delaying

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code"). The Court sets forth certain references and citations in the footnotes of this Opinion solely to allow for the provision of more (rather than less) information; the use of footnotes is not intended to minimize the importance of the materials or their relevance to the Court's holding.

confirmation of the Debtor's plan are the subject Motion to Avoid Lien on Debtor's Principal Residence (the "Motion") and the proper treatment of the Creditor's claim in this case. ECF 20.

The Debtor appears to have inherited an ownership interest in property commonly known as 4636 Kernwood Avenue, Baltimore, Maryland 21212 (the "Property") in 2017. The Debtor currently resides at the Property, and it is her principal residence. At the time that the Debtor obtained her ownership interest, at least two liens were asserted against the Property: (a) a first priority lien held by Midfirst Bank (a/k/a Midland Mortgage) ("Midfirst"); and (b) a second priority lien held by Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust as Trustee for PNPMS Trust II (the "Creditor").

Midfirst's interest in the Property relates to a 2002 mortgage loan in the original principal amount of $47,227.00. The Debtor subsequently entered into loan modifications with Midfirst, altering the original principal amount due on the loan. Midfirst filed a proof of claim in this case for a secured claim in the amount of $55,849.62. ECF 35; 31, Ex. A; Claim No. 3.

The Creditor's interest in the Property relates to a 2008 home equity line of credit in the original principal amount of $70,241.00. Claim No. 4. According to the Creditor's proof of claim, the amount due on the line of credit as of the petition date is $139,604.09. *Id*. Although the Creditor's interest in the Property appears to have been perfected after that of Midfirst, the Creditor asserts that its lien trumps at least a portion of Midfirst's lien against the Property.

The Debtor's first proposed chapter 13 plan did not address the alleged arrears on the Creditor's claim, and the Creditor filed an objection to the plan on that basis. ECF 4, 17. The Debtor subsequently amended her plan and filed the Motion. ECF 20, 22. By the Motion, the Debtor seeks to avoid the Creditor's lien against the Property. The Creditor filed a response to the Motion. ECF 21. The Court held an evidentiary hearing on the Motion and all related papers on

June 6, 2024 (the "Hearing"). The parties then each submitted post-Hearing briefs. ECF 34, 35. This matter is now ripe for resolution.[2]

## II. Findings of Fact and Conclusions of Law

Chapter 13 of the Code allows a debtor to restructure her financial obligations through a three- to five-year repayment plan.[3] In general, a debtor may provide different treatment to her secured and unsecured creditors and, under certain circumstances, may bifurcate a creditor's claim between those secured and unsecured plan classes. Specifically, section 506 of the Code allows a debtor to modify a creditor's secured claim by (a) capping the amount of the creditor's allowed secured claim by the value of the creditor's collateral and (b) granting the creditor an allowed unsecured claim for any remaining amounts. 11 U.S.C. § 506(a). This approach to the treatment of secured claims seeks to appropriately balance the rights of secured creditors and the debtor, giving secured creditors a key benefit of their prepetition bargain and debtors an opportunity to rehabilitate and strengthen their financial condition through the bankruptcy process.[4]

A debtor does not possess this general modification power, however, with respect to claims secured solely by an interest in the debtor's principal residence. Section 1322 of the Code provides that a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim

---

[2] The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. The District Court has referred this case and this matter to this Court under 28 U.S.C. § 157(a) and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. § 157(b)(2). This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to this matter by Bankruptcy Rules 7052 and 9014.

[3] *See, e.g.*, *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) ("Congress enacted the 1978 Bankruptcy Reform Act with the overarching goal of providing debtors with a 'fresh start.' H.R. Rep. No. 95-595, at 118 (1978). Among other changes, Congress significantly revamped Chapter 13 to better 'facilitate adjustments of the debts of individuals with regular income through flexible repayment plans funded primarily from future income.' 8 Collier on Bankr. (MB) ¶ 1322.01 (2018)."); *see also Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 367 (2007) ("[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor'") (internal citations omitted).

[4] *See, e.g.*, *In re McNeely*, 366 B.R. 542, 548 (Bankr. N.D.W. Va. 2007) ("Regarding the purpose and spirit of Chapter 13, the hallmark of a Chapter 13 case is the Congressionally imposed bargain between the debtor and the debtor's creditors whereby the debtor is allowed to keep pre-petition property in exchange for promising a future stream of payments to the debtor's pre-petition creditors.").

secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." 11 U.S.C. § 1332(b)(2).[5] As a result, a debtor generally may not bifurcate a mortgage creditor's claim and strip off the unsecured portion of the creditor's lien. The one exception in the chapter 13 context is a wholly-unsecured mortgage claim, which may be removed from the property through sections 506, 1322, and 1325 of the Code.[6]

The matter before the Court requires it to determine not only the value of the Property and the amount of the Creditor's allowed secured claim, but also whether the Creditor's allowed secured claim is subject to reduction under section 506 of the Code and, if so, in what amount.

A.  *Value of the Property*

The first step in the Court's analysis is to determine the value of the Property for purposes of section 506 of the Code.[7] The Court starts with valuation because if any portion of the Creditor's claim is supported by the value of the Property, the Debtor may not modify it under her chapter 13 plan. That determination would, in turn, resolve the other legal issues presented by the Motion and briefed by the parties.

Courts disagree concerning the appropriate date to value collateral under section 506 of the Code.[8] The only guidance offered by the statutory text is that the value of the collateral "be

---

[5] In addition, section 1322(b)(5) provides that "notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5).

[6] *See, e.g.*, *Branigan v. Davis*, 716 F.3d 331, 335–36 (4th Cir. 2013); *Johnson v. Asset Management Group, LLC*, 226 B.R. 364 (Bankr. D. Md. 1998) (relying on *Nobleman v. American Sav. Bank*, 508 U.S. 324 (1993)).

[7] The Debtor bears the burden of proof on valuation for purposes of sections 506(a) and 1322 of the Code. *See, e.g.*, *In re Johnston*, No. 12-51263, 2013 WL 1844751 at *3 (Bankr. W.D. Va. Apr. 12, 2013) (holding that a debtor must prove by a preponderance of the evidence that they are entitled to strip a valueless lien under § 506) (*relying on Schaffer v. Weast*, 546 U.S. 549 (2005) (holding that the burden of proof generally rests on the party seeking relief)). For the reasons set forth below, the Court determines that the Debtor has met her burden in this case.

[8] *See, e.g.*, *In re Montiel*, 572 B.R. 758, 761 (Bankr. W.D. Wash. 2017) (explaining split in the case law on appropriate valuation date and collecting cases); *see also Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997) (explaining that the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question.").

determined in light of the purposes of the valuation and of the proposed disposition or use." 11 U.S.C. § 506(a). Here, the Debtor proposes to continue to use the Property as her principal residence; she made that use known, and began to carry it out, as of the petition date. She seeks the valuation to determine the estate's and the Creditor's rights in the Property. Although the Court generally agrees with those courts using the petition date for purposes of valuing property in the residential lien stripping context,[9] the Court does not find the date of the valuation determinative in this particular matter. Rather, the content and evaluation of each appraisal determines the value and drives the Court's ultimate decision.[10]

The parties offered competing valuations of the Property.[11] The Debtor's appraiser stated a value of $50,000.00 for the Property as of August 2023, and the Creditor's appraiser stated a value of $95,000.00 for the Property as of April 2024. ECF 30, Ex. E; 31, Ex. B. The Creditor also offered other evidence in support of its valuation, but the Court discounts the weight provided to those valuations based on their generic nature; lack of foundational information concerning methods, assumptions, and conclusions; and from the Court's perspective, general unreliability given the particular facts and circumstances of this matter.[12]

---

[9] *See, e.g.*, *Montiel*, 572 B.R. at 762–763.

[10] The Court acknowledges that neither party presented valuations as of the petition date. The Debtor's valuation pre-dates the petition date, and the Debtor used that valuation on her bankruptcy schedules, which were filed on the petition date. ECF 1. The Creditor's valuation is approximately three months after the petition date. The valuation dates are within eight months of each other, and neither party raised the valuation date as an issue in this case.

[11] The parties stipulated to the admission of these appraisals as evidence in this case. As the Court stated at the Hearing, the Court is concerned about the lack of any supporting testimony for the valuations, as well as the inability to ask questions of the appraisers regarding the valuations. Nonetheless, the Court considers each appraisal based on the papers, the entirety of the docket in this case, and applicable law. The Court also notes that where, as here, the parties have stipulated to the admission of evidence, the "'stipulation by its very nature signals the intentional relinquishment of any and all rights to challenge the admissibility of the stipulated evidence, and is a clear example of waiver if anything is.'" *In re Nubia*, No. 2:19-BK-24337-NB, 2021 WL 1561544, at *2–3 (B.A.P. 9th Cir. Apr. 21, 2021) (quoting *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1184 (10th Cir. 2009)).

[12] ECF 30, Exs. A, B, C. *See, e.g.*, *In re Slovak*, 489 B.R. 824, 826–827 (Bankr. D. Minn. 2013) (stating that "[i]nternet searches are insufficient evidence of property value because they are at best questionable and at worst evidence of nothing" and explaining that tax assessments must be supported by additional evidence); *In re Cochreham*, No. 13-26465-A-13J, 2013 WL 4510694 (Bankr. E.D. Cal. Aug. 23, 2013) (refusing to admit Zillow information as valuation evidence); *see also* Hon. Eugene R. Wedoff, *How to Litigate the Value of a Single Family Home*, Am. Bankr. Inst. Annual Meeting, Spring 2017 (reviewing case law addressing valuation evidence in individual debtor cases) (available on Westlaw, 042017 ABI-CLE 105).

The Court has carefully reviewed each party's appraisal.[13] The primary difference between the two appraisals concerns adjustments for the condition of the Property and the likely cost of necessary repairs. For example:

- Each report summarizes the differences in overall perspective, in that the Debtor's appraiser notes "signs of deferred maintenance, possible health issues and possible structural issues noted at the time of the inspection;" and the Creditor's appraiser notes "unit reflects standard maintenance and care … no observed evidence of physical or functional inadequacies or deficiencies .. [no] adverse conditions that would have a negative effect on the liveability, soundness or structural integrity of the subject property." ECF 31, Ex. B at 2; 30, Ex. E at 3.

- The Debtor's appraiser later expands on the identified issues, explaining "there is extensive deferred maintenance in the subject property. It was so extensive that it was beyond my expertise to determine a cost to cure. The current condition of the subject is considered to have an effect on the liveability of the subject property." ECF 31, Ex. B at 8. Pages eight and nine of that report identify at least 25 different issues with the home, including potential structural issues, dark spots, and a lack of handrails which are required by Baltimore City Code. *Id*. at 8–9. The Debtor's appraiser includes color pictures in support of his assessment and those pictures show many of the issues described in the report. *Id*. at 18, 21–40.

- The Creditor's appraiser does not expand on any potential structural or liveability issues, and does not appear to consider these kinds of issues significant to the valuation. ECF 30, Ex. E, at 3–5. The Creditor's appraiser does include pictures, which are difficult to discern (they appear to be in black and white) but do note things such as "water in basement," and "possible mold." *Id*. at 17–22.

The Court agrees with the Debtor that the Creditor's appraisal fails to account for several significant structural and functional issues with the Property. The Creditor's appraisal suggests that the Property could be repaired for approximately $9,800.00, which is unrealistic based on the descriptions and pictures included in the reports.[14] ECF 30, Ex. E, at 16. It also fails to address in

---

[13] As one court has explained, the "valuation of assets is 'not an exact science.' Courts are not bound by appraisals presented in determining the value of property, and the Court may form its own opinion after giving the appraisals and the appraisers' testimony consideration. 'The Court may look to the accuracy, credibility and methodology employed by the appraisers' to determine the proper valuation of property. When two appraisal reports conflict, a court should carefully compare 'the logic of their analyses' and 'the persuasiveness of their subjective reasoning.'" *In re Hassan*, No. 14-73711-REG, 2015 WL 5895481, at *5 (Bankr. E.D.N.Y. Oct. 8, 2015).

[14] Indeed, the appraiser qualifies this estimate with the following statement: "Appraiser is not a contractor. Therefore, aside from obvious visual non specific repairs, the appraiser will not be listing any other repairs. The repairs appear to be beyond the knowledge of the appraiser. *There appears to be lots of repairs needed.*" ECF 30, Ex. E, at 16 (emphasis added).

any detail observations or findings to support the statement that the Property is in standard maintenance condition with no adverse effects on liveability.

That said, the Court also acknowledges some potential issues with the Debtor's appraisal. Most notably, the appraisal value appears to be close to the original purchase price for the home and less than sales prices for other homes in the area. Nevertheless, looking at the explanations provided by the Debtor's appraiser and the comparables included in that appraisal, the Court finds the Debtor's valuation more thorough, reliable, and closer to the actual market value of the home.

The Debtor's appraisal includes six well-documented comparable transactions. ECF 31, Ex. B at 3–4. Each of the comparables is similar to the Property in style, location, or both. The Debtor's appraiser walks through each comparable in the report, noting the adjustments made and the reasons supporting those adjustments. In reviewing the square footage, location, amenities, and overall condition of the comparables in relation to the Property,[15] the Court finds the Debtor's appraiser's conclusions reasonable and justified.[16] As such, the Court will use the value of $50,000.00 in evaluating the remaining legal and factual issues posed by the Motion.

---

[15] Here, the Court focused on the downward adjustments made, for example, when the comparable had a finished basement or central air, or had been remodeled and was in better condition than the Property. ECF 31, Ex. B, at 3–4. Based on the other information in the appraisal concerning the age and condition of the Property, all adjustments appeared warranted and within a reasonable range. As the Debtor's appraiser noted in the report, "After reviewing the deferred maintenance and the potential structural and health issues in the subject property the value estimated in this report revised [as of August 24, 2023]." ECF 31, Ex. B, at 4. The adjusted value range for the Debtor's comparables was $33,440.00 to $54,040.00.

[16] The Creditor's appraisal also relies on a comparable valuation approach; it includes four comparables with no adjustments for the condition of the Property. ECF 30, Ex. E, at 4, 9. The Creditor's adjusted value range is $59,050.00 to $102,500.00, and is not explained in the context of the prior transfer amounts disclosed for the comparables. ECF 30, Ex. E, at 9. The appraisal also includes an Addendum with additional listings but no adjustments or explanations. ECF 30, Ex. E, at 16. The Court did not find the Creditor's appraisal as thorough or as detailed as that provided by the Debtor. The Creditor's appraisal comes across as a high level report based on publicly-available information and without much Property-specific analysis. *See, e.g.*, *In re Levin*, No. 8-17-77330-LAS, 2020 WL 1987783 at *4 (Bankr. E.D.N.Y. Apr. 24, 2020) ("Although no appraisal is perfect, courts have recognized that more deficiencies in one appraisal adversely affect its reliability when compared to another appraisal also shown to have deficiencies.") (*citing In re Pod*, 560 B.R. 77, 83 (Bankr. E.D.N.Y. 2016)).

*B. Timing of Liens Against the Property and Import Under Section 506*

The next issue for the Court concerns whether the pre-existing nature of the Creditor's lien impedes in any way the Debtor's ability to remove it from the Property. Specifically, the Creditor argues that because its lien was perfected against the Property prior to the Debtor obtaining an ownership interest in the Property, the Debtor may not affect the lien under the Code.

The Creditor extended the home equity loan underlying the subject lien in 2008, and the Debtor inherited her interest in the Property in 2017. From a temporal perspective, the Creditor's statements are correct. From a legal perspective, however, the Creditor's suggested result belies the language of the Code.

Section 506 of the Code provides that a creditor holds a secured claim "to the extent of the value of such creditor's interest in *the estate's interest* in such property" and an unsecured claim "to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim." 11 U.S.C. § 506(a) (emphasis added). Although a mortgage creditor whose claim is secured solely by the debtor's principal residence is generally not subject to bifurcation under section 506(a), if that creditor's interest in such property is wholly unsecured, the debtor may treat the creditor as an unsecured creditor under the chapter 13 plan, thereby removing the lien from the property through the chapter 13 process.

This result is not only supported by the case law but also by the language of the statute itself:

- a creditor has a secured claim only if supported by the value of the collateral under section 506(a) of the Code;

- if that creditor is a mortgage creditor and there is *no* supporting collateral value, the creditor's claim may be deemed unsecured under sections 506 and 1322 of the Code on the motion of the debtor;[17]

---

[17] Notably, the relevant language of section 1322 speaks to "the rights of holders of secured claims;" if the value of the collateral does not support the creditor's claim, the creditor does not hold a "secured" claim for purposes of

- if the debtor does not otherwise object to the creditor's unsecured claim, the creditor holds an allowed unsecured claim under sections 501 and 502 of the Code; and

- finally, subsections 1325(a)(4) and (a)(5) of the Code provide for the treatment of allowed secured and allowed unsecured claims under the debtor's plan.[18]

Assuming the debtor's plan complies with these statutory mandates, is confirmed, and is completed, the debtor may receive a discharge (if eligible) and the wholly-unsecured mortgage creditor has no remaining lien in the property after completion of the case.[19]

Applying the foregoing analysis to the facts of this matter, the Debtor may seek to value and classify the Creditor's claim under section 506 of the Code, which would allow the Debtor to strip off the Creditor's lien from the Property if its claim is wholly unsecured.[20]

Nevertheless, the Creditor argues that the Debtor may not strip off its lien because the lien was in existence prior to the Debtor obtaining her ownership interest in the Property. Under the Creditor's argument, the Property is forever subject to the Creditor's lien, even if the collateral holds no value for the Creditor's claim and the Debtor pays the Creditor's allowed claim in accordance with the Code.

---

sections 506(a) and 1322(b)(2). 11 U.S.C. § 1322(b)(2); *see also, e.g.*, *In re Miller*, 462 B.R. 421, 427 (Bankr. E.D.N.Y. 2011) (discussing *In re Pond*, 252 F.3d 122, (2d Cir. 2001), "in which the Second Circuit held that 'the anti-modification exception of Section 1322(b)(2) protects a creditor's right in a mortgage lien only where the debtor's residence retains enough value—after accounting for other encumbrances that have priority over the lien—so that the lien is at least partially secured under Section 506(a).' *Id.* at 126.").

[18] Based on these statutory provisions, a debtor may seek—either under its plan or by motion (in some districts, such as Maryland)—to remove the unsecured lien from the subject property. Fed. R. Bankr. P. 3012; Md. L. Bankr. R. 3012-1, 3015-1

[19] "Bankruptcy relief should be effective and should provide the debtor with a fresh start." 8 Collier ¶ 1300.02, *citing* H.R. Rep. No. 595, 9th Cong. 1st Sess. 117 (1997). The Court recognizes a split in the case law concerning whether a chapter 13 debtor may strip off an unsecured lien from her principal residence if she is not eligible for a discharge. *See, e.g.*, *Miller*, 462 B.R. at 434 (discussing split and holding that "the strip off of wholly unsecured mortgage debt is permissible under a chapter 13 plan for a debtor who is ineligible to obtain a discharge, and will be effective when payments required pursuant to § 1322(b)(1) and otherwise under the plan are completed"). The Court does not address this specific issue because the Debtor in this case appears to be eligible for a discharge, if she satisfies her obligations under the Code, and in addition, no party raised the issue.

[20] The Creditor filed a proof of claim in this case asserting that it is a creditor holding a secured claim in the amount of $139,604.09. Claim No. 4; 11 U.S.C. § 101(5); *see also Johnson v. Home State Bank*, 501 U.S. 78 (1991) (discussing broad definition of "claim" under the Code and holding that an obligation enforceable only against the debtor's property, but not in personam against the debtor, falls within that definition).

The Creditor cites a few cases to support its position, but those cases are distinguishable from—and completely inapposite to—the matter before the Court. Most notably, several of the cases address a debtor's attempt to avoid a creditor's lien under section 522(f) of the Code.[21] That section speaks to a debtor's ability to avoid a lien that impairs an exemption claimed by the debtor. Section 522 provides, in relevant part, that "'the debtor may avoid the fixing of a [judicial] lien on *an interest of the debtor* in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section'… [a] debtor may avoid a lien under that section if '(1) there was a fixing of a lien on *an interest of the debtor* in property; (2) such lien impairs an exemption to which the debtor would have been entitled; and (3) such lien is a judicial lien.'" *See In re Pederson*, 230 B.R. 158, 159–160 (9th Cir. 1999) (quoting 11 U.S.C. § 522(f)) (emphasis added). The cases cited by the Creditor reason that a pre-existing lien cannot be fixed to a later-obtained interest of (or impede a later-claimed exemption by) the debtor.[22] That is not the situation before the Court.

The amount of the Creditor's allowed secured claim, if any, is determined by section 506 of the Code, and its treatment under the Debtor's plan is governed by sections 1322 and 1325 of the Code. The language of these sections focuses on the amount of the Creditor's claim as compared to the value of the estate's interest in the Property. The language is not focused on the debtor's interest or the debtor's ability to claim an exemption. As a result, under the relevant sections of the Code, the Debtor may strip off the Creditor's lien from the Property, provided that the Creditor's claim is wholly unsecured.

---

[21] ECF 34 (citing *Matter of Fiore*, 27 B.R. 48 (Bankr. Conn. 1983); *McCormick v. Mid-State Bank Trust Co.*, 22 B.R. 997 (Bankr. W.D. Pa. 1982); *In re Chandler*, 77 B.R. 513 (Bankr. E. D. Pa. 1987) (although cited as contrary case, it also relies on section 522(f)). The Creditor also cites *In re Fogarty*, 114 B.R. 788 (Bankr. S.D. Fla. 1990), but that case relies on section 544 of the Code and deals with perfection of a security issue.

[22] These cases all align with the Supreme Court's holding in *Farrey v. Sanderfoot*. 500 U.S. 291, 298–99 (1991) (holding that, under section 522(f)(1), a judgment lien which attaches simultaneously with debtor's acquisition of interest in the property cannot be avoided because it did not attach to an interest of the debtor in the property).

*C.  Amount and Priority of the Creditor's Allowed Claim*

The final question concerns the priority of the liens held by Midfirst and the Creditor and the amount of the Creditor's secured claim, if any. As noted above, Midfirst asserts a secured claim in the amount of $55,849.52 in the case. A comparison of the amount of Midfirst's lien against the value of the estate's interest in the Property suggests that the entire $50,000.00 in value flows to Midfirst, making the Creditor's claim wholly unsecured. The Creditor disputes this conclusion.

The Creditor argues that the loan modifications executed between the Debtor and Midfirst adjust the priority of the parties' liens and give the Creditor at least a partial secured claim. The Creditor's argument focuses on loan modifications subsequent to the perfection of its interest in 2008 that increased the amount of Midfirst's claim.

The Debtor's agreements with Midfirst and the Creditor are governed by Maryland law. Section 7-111 of the Maryland Real Property Code provides, in relevant part, that "[s]ubject to subsection (b) of this section, any change or modification to a mortgage or deed of trust or to an obligation secured by a mortgage or deed of trust does not extinguish the existing lien of the mortgage or deed of trust or otherwise adversely affect the existing lien priority of the mortgage or deed of trust." MD. CODE ANN., REAL PROP. § 7-111. Subsection (b), in turn, states that, if the modification "increases the principal sum secured by the mortgage or deed of trust above the amount appearing on the face of the mortgage or deed of trust and expressed to be secured by it," then the "existing lien priority of the original mortgage or deed of trust shall continue as to the principal sum secured by the mortgage or deed of trust immediately preceding the change or modification; and … [t]he lien priority for the increase in the principal sum shall date from the date of the changed or modified mortgage or deed of trust." MD. CODE ANN., REAL PROP. § 7-111.

The United States District Court for the District of Maryland has interpreted this statute to mean exactly what it says, namely that the first priority creditor continues its senior position as to

the full principal amount identified on the deed of trust and is subordinate only to the amount of increase above that principal amount. *Kitcher v. Wilmington Trust, N.A.*, No. 20-832, 2021 WL 915605 (D. Md. Mar. 10, 2021). As explained in *Kitcher*, a loan modification in any amount lower than the mortgage's principal sum does not affect the priority of the original mortgage.[23] Applying that analysis to the facts before the Court, the only modification that affected the priority of the original loan between Midfirst and the Debtor was the May 5, 2023, increase to $48,611.43 – only $1,584.43 over the principal sum. ECF Nos. 34, 35.

The Debtor posits that this analysis results in Midfirst holding a first priority lien in the amount of $51,521.92, leaving no value to support the Creditor's secured claim.[24] Although this position may comport with the plain language of the statute and may be viewed as favorable to Midfirst, this kind of determination by the Court would affect the legal rights of Midfirst in this case, basically subordinating a portion of its claim to that of the Creditor. Midfirst is not a party to this contested matter. Consequently, even if the Debtor's position has merit and the Creditor's position reaches too far, "due process requires that [those issues] be resolved only after the extent of the priority of the first mortgage is determined in a proceeding in which the holder of the first mortgage is a party." *In re Jeong Soon Kim*, No. 18-26438-DER, 2019 WL 3557109, at *1 (Bankr. D. Md. Aug. 2, 2019).

---

[23] *Kitcher*, 2021 WL 915605, at *2 (addressing section 7-111 and explaining that "[t]he Modification Agreement here shows a principal amount lower than the principal sum owed on the original deed of trust ($636,921.19, compared with the original sum of $664,000), so the Agreement did not affect the validity or priority of the lien").

[24] The Debtor calculates this amount by using Midfirst's proof of claim amount ($55,849.62), less amounts that the Debtor suggests could be subordinate under the statute and the parties' agreement, namely $4,327.70 (which is the total of $2,743.27 and $1,584.43 identified by the Debtor as possible subordinated principal debt). ECF 35, at 2. The Debtor does not explain the amounts above the original principal amount included in the $51,521.92, but presumably they relate to fees and costs under the loan documents. Claim 3-1, at 2; Claim 3-2, at 2; *see also* Claim 3-1, Ex. 5 (Midfirst's Deed of Trust stating that it secures the debt (principal amount) with interest, and all other sums with interest). Because the Court is not resolving this issue on a final basis at this time, the Court will allow the parties to further address the issue (and other issues related to subordination) in subsequent papers or at a further hearing.

### III.    Conclusion

The Debtor has established a valuation of the Property that may permit her to strip off the Creditor's claim. That determination is governed by sections 506, 1322, and 1325 of the Code and turns largely, at this point, on the application of state law to the claims of Midfirst and the Creditor. Because Midfirst is not yet a party to this contested matter, the Court will reserve its ruling on the priority and amount of the two creditors' claims until the Debtor has had an opportunity to properly notice Midfirst of the dispute. The Court will enter a separate order consistent with this Memorandum Opinion.

cc:    Debtor
       Debtor's Counsel
       Creditor's Counsel
       Chapter 13 Trustee
       All Creditors

**END OF MEMORANDUM OPINION**